UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON

DON BLANKENSHIP

      Plaintiff

v.                                    Civil Action No. 2:05-0606

JOE MANCHIN, III,
in his individual capacity
and in his official capacity
as Governor of the
State of West Virginia,

      Defendant

MEMORANDUM OPINION AND ORDER

      Pending are defendant's motions (1) to dismiss, and (2) to stay discovery pending a ruling on the motion to dismiss.  The motions were filed respectively on September 13 and October 31, 2005.  The court ORDERS that plaintiff's motion for leave to file a surreply, filed November 4, 2005, be, and it hereby is, granted.

I.

      The defendant contends that this "action is a politically motivated publicity stunt with no basis in law or fact . . . . [that] should be di[s]missed at the threshold."

(Def.'s Mem. in Supp. at 1).  At this early stage of the litigation, the court is not at liberty to make value judgments concerning the parties' respective factual positions.  As discussed more fully within, the court is required instead to "'assume the truth of the material facts as alleged in the complaint.'"  <u>Jackson v. Birmingham Bd. of Educ.</u>, 125 S. Ct. 1497, 1503 (2005) (quoting <u>Summit Health, Ltd. v. Pinhas</u>, 500 U.S. 322, 325 (1991)).  As noted by the leading commentators on the Federal Rules of Civil Procedure, "the purpose of a motion under Federal Rule 12(b)(6) is to test the formal sufficiency of the statement of the claim for relief; the motion is not a procedure for resolving a contest between the parties about the facts or the substantive merits of the plaintiff's case."  5B Charles Alan Wright and Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1356 (3d ed. 2004).

In accordance with these principles for handling defenses interposed during the infancy of a civil action, the court fully credits, as it must, plaintiff's version of the events.

II.

Plaintiff Don Blankenship is a citizen of Mingo County, West Virginia.  (Compl. ¶ 6).  He is the chairman, chief executive officer, and president of Massey Energy Company ("Massey").  (Id.).  Massey, a non-party, is one of the largest coal producers and employers in West Virginia.  (Id. ¶ 9).  Defendant Joe Manchin III is the governor of the State of West Virginia and residing necessarily in Kanawha County.  (Compl. ¶ 7).

Plaintiff has been a very active, recent participant in West Virginia politics.  In 2004, he contributed substantial sums of money to oppose the re-election bid of Warren McGraw, then a sitting justice on the West Virginia Supreme Court of Appeals.  (Id. ¶ 9)  In 2005, plaintiff publicly opposed legislation supported by the defendant to finance workers' compensation benefit plans through an increased coal severance tax.  (Id.)

Later in 2005, plaintiff distinguished himself as a vocal, and well-financed, opponent of the defendant's plan to sell $5.5 billion in bonds to cover state pension programs ("bond proposal" or "plan").  (Id. ¶ 10).  The bond proposal required voter ratification at a special election on June 25, 2005.  (Id.)

3

In the months leading up to the special election, a "contentious statewide campaign was waged between proponents of the . . . [bond proposal] and those who opposed" it.  (<u>Id.</u> ¶ 13).

Beginning in early June 2005, plaintiff voiced his opposition to the bond proposal through a variety of media outlets and interviews.  (<u>Id.</u> ¶ 14).  Among other things, he personally financed television, radio, and direct mail advertisements encouraging rejection of the bond proposal.  (<u>Id.</u>)  Plaintiff also personally phoned the defendant to inform him of his opposition to the plan.  (<u>Id.</u>)

The defendant launched a corresponding campaign in support of the plan.  (<u>Id.</u> ¶ 15).  As part of that effort, it is alleged that the defendant:

> devoted a disproportionate amount of . . . resources to negative public comments and advertisements against Plaintiff, including inaccurate characterizations of Plaintiff as an outsider who was simply interested in raising taxes and who sought revenge for the recent raise in severance taxes.  Upon information and belief, during the course of the campaign, members of the Governor's staff even made inquiries at the office of the West Virginia Secretary of State regarding Plaintiff's residency.

(<u>Id.</u>).

Some of the referenced public comments came on June 17, 2005, during defendant's appearance at American Electric Power

4

Company's John Amos plant in Putnam County.  (Id. ¶ 16).
Following a brief speech, the defendant entertained media
inquiries.  During those comments, "the Governor threatened
Plaintiff by warning that the government would scrutinize the
affairs of Plaintiff and Massey even more closely in light of
Plaintiff's decision to participate in the public debate over"
the bond proposal.  (Id.)  The defendant was quoted as saying "'I
think that is justified now, since Don has jumped in there with
his personal wealth trying to direct public policy.'"  (Id. ¶ 16
(quoting Ken Ward, Jr., Manchin Still Sparring Over Pension Bond
Bid, Charleston Gazette, 2005 WLNR 9764145 (Jun. 18, 2005)).[1]

---

[1]Although the court normally does not consider extrinsic
materials beyond the complaint in the midst of a Rule 12(b)(6)
analysis, the news article is an exception.  It was attached to
defendant's motion to dismiss and quoted in the complaint at
paragraph 16.  Our court of appeals has observed as follows:

> Although as a general rule extrinsic evidence should
> not be considered at the 12(b)(6) stage, we have held
> that when a defendant attaches a document to its motion
> to dismiss, "a court may consider it in determining
> whether to dismiss the complaint [if] it was integral
> to and explicitly relied on in the complaint and [if]
> the plaintiffs do not challenge its authenticity."
> Phillips v. LCI Int'l Inc., 190 F.3d 609, 618 (4th Cir.
> 1999)

American Chiropractic Ass'n v. Trigon Healthcare, Inc., 367 F.3d
212, 234 (4th Cir. 2004).

In context, the above-cited news article provides as follows:

> Gov. Joe Manchin continued Friday to spar with Massey Energy President Don Blankenship over the governor's multimillion-dollar pension bond proposal. The governor said Blankenship, who has launched a personal campaign against the bond plan, should expect tougher scrutiny of his business affairs.
>
> "I think that is justified now, since Don has jumped in there with his personal wealth trying to direct public policy," Manchin said.
>
> . . . .
>
> After his brief speech at AEP's pollution-control project announcement at its John Amos Power Plant outside St. Albans, Manchin was quizzed repeatedly by reporters about his pension bond battle with Blankenship.
>
> In a later interview, Manchin declined to say if he thought Blankenship was "a good corporate citizen."
>
> "I'm not going to sit here and try to rag on anyone," Manchin said.
>
> "I truly appreciate and value every business person who creates jobs in our state," the governor said. "[But] I want Don to use his creative energies in a good, positive manner."
>
> Manchin said he was puzzled that Blankenship would not agree to serve on a pension bond advisory committee before launching his campaign against the governor's proposal.
>
> "The most frustrating thing going on is that there's a person who has been very successful financially in the business world, and when someone asked him to be a part of a positive movement in West Virginia, he said, 'No.'"

6

> When asked, Manchin said that Blankenship's campaign
> against the pension bonds <u>should and will prompt even
> more scrutiny of Blankenship</u>, who is arguably already
> the state's highest-profile coal executive.
>
> "<u>If you want to throw yourself into public policy, your
> record is open</u>," the governor said.
>
> Manchin declined to personally offer any specific
> criticisms of the way Massey or Blankenship has
> operated, <u>except to note that the company has had
> numerous run-ins with state environmental regulators</u>.
>
> "<u>I think there have been many violations that hopefully
> they've been able to correct</u>," the governor said.

Ken Ward, Jr., <u>Manchin Still Sparring Over Pension Bond Bid</u>,

Charleston Gazette, 2005 WLNR 9764145 (Jun. 18, 2005) (emphasis

supplied).

On June 25, 2005, voters rejected the bond proposal.
(Compl. ¶ 18).  On June 30, 2005, the West Virginia Department of
Environmental Protection ("DEP") gave preliminary approval to
Massey's application for several permits, including one to build
a second coal silo in Raleigh County.  (<u>Id.</u> ¶ 19).  Plaintiff
contends this preliminary approval indicates the proposed silo
satisfied all statutory and regulatory prerequisites.  (<u>Id.</u>)

Plaintiff alleges that the defendant "publicly ordered
members of his senior staff to meet thereafter with DEP
representatives, the Department of Health and Human Resources and
the West Virginia Office of Miners' Health, Safety and Training

7

to investigate alleged 'possible safety concerns' related to the site."  (Id. (quoted authority omitted)).  Counsel advised the court at the scheduling conference on December 15, 2005, that the defendant so directed his staff the same day DEP gave its preliminary approval.[2]  Plaintiff contends "[t]hese same concerns had already been raised by various interest groups without any meaningful response from the Governor prior to the special election and the permit approval."  (Id.)  Plaintiff thus concludes, on "information and belief, the Governor caused this investigation not out of concern for the safety of residents, but instead, in retaliation for Plaintiff's campaign against the" bond proposal.  (Id.)

Plaintiff further alleges that "a potential landlord of Massey informed [it] that it would be reluctant to enter into a lease with Massey because, based on the Governor's threats, Massey might be the subject of retaliatory regulatory sanctions that would impair Massey's ability to perform on any lease." (Id. ¶ 20).  Based upon these two factual predicates, plaintiff summarizes the nature of his claim in paragraph 21 of the

_____

[2]The court notes it has received two pieces of correspondence from counsel for the defendant following the scheduling conference.  Although each discusses elements of the time line of the events in this case, neither suggests in any way that the defendant's directions to his staff came at a time other than the day of preliminary approval by the DEP.

8

complaint:

> The Governor's threat to cause state regulators to
> investigate and exercise greater scrutiny over
> Plaintiff and Massey in retaliation for Plaintiff's
> public opposition to the . . . [bond proposal]
> interfered with and restrained Plaintiff in the
> exercise of his First Amendment right to free speech.
> Because Massey is a publicly traded corporation, to
> which Plaintiff owes fiduciary duties as an officer and
> director, the Governor's threats pose a difficult
> dilemma, in which Plaintiff is forced to choose between
> continuing to exercise his First Amendment rights, on
> the one hand, and protecting the business affairs of
> Massey from retaliatory government scrutiny on the
> other.

(Id. ¶ 21.)


The prayer for relief seeks a judgment that includes

the following elements:

> 1)    Declar[ing] that Defendant violated Plaintiff's First
>       Amendment right to free speech by stating . . . that
>       the government would scrutinize the affairs of
>       Plaintiff and Massey more closely in light of
>       Plaintiff's decision to participate in the public
>       debate over the . . . [bond proposal];
>
> 2)    Permanently enjoin[ing] Defendant, his successor in
>       office, agents, employees and persons acting in concert
>       with him, from threatening governmental investigation
>       and/or regulation of Plaintiff or Massey in retaliation
>       for Plaintiff's exercise of his First Amendment right
>       to free speech;
>
> 3)    Permanently enjoin[ing] Defendant, his successor in
>       office, agents, employees and persons acting in concert
>       with him, from any form of retaliation against
>       Plaintiff or Massey in response to Plaintiff's exercise
>       of his First Amendment right to free speech;
>
> 4)    Award[ing] Plaintiff his compensatory damages in an

amount to be determined at trial;

5)   Grant[ing] Plaintiff his costs . . . including
     reasonable attorney's fees, pursuant to 42 U.S.C. §
     1988 and any other applicable authority . . . .

(Compl. prayer for relief ¶¶ 1-5).

        The defendant moves to dismiss, asserting : (1) the
complaint fails to adequately allege a First Amendment violation,
(2) plaintiff lacks standing to assert a claim on behalf of
Massey, the party that suffered the alleged harms, (3) the
defendant is entitled to qualified immunity on the individual
capacity claim, (4) plaintiff is not entitled to monetary damages
on the official capacity claim, and (5) plaintiff is not entitled
to injunctive relief absent an ongoing violation of federal law.


                              II.


A.   Standards Governing Motions Pursuant to Rules 12(b)(6) and
     12(b)(1)


        A motion to dismiss pursuant to Rule 12(b)(6) should
not be granted "unless it appears certain that the plaintiff can
prove no set of facts which would support . . . [his] claim and
would entitle . . . [him] to relief." Greenhouse v. MCG Capital
Corp., 392 F.3d 650, 655 (4th Cir. 2004) (quoting Mylan Labs.,

                              10

<u>Inc. v. Matkari</u>, 7 F.3d 1130, 1134 (4th Cir. 1993)).
Additionally, the "complaint [is viewed] in the light most
favorable to the plaintiff and . . . all well-pleaded
allegations" are accepted as true.  <u>South Carolina Dept. of
Health & Environ. Control v. Commerce & Industry Ins. Co.</u>, 372
F.3d 245, 255 (4th Cir. 2004) (quoting <u>Franks v. Ross</u>, 313 F.3d
184, 192 (4th Cir. 2002)).  Further,  beyond the facts alleged,
the court is required to "draw[] all reasonable . . . inferences
from those facts in the plaintiff's favor . . . ."  <u>Edwards v.
City of Goldsboro</u>, 178 F.3d 231, 244 (4th Cir. 1999).

        A complaint need not "make a case" against a defendant
or "forecast evidence sufficient to prove an element" of the
claim.  <u>Chao v. Rivendell Woods, Inc.</u>, 415 F.3d 342, 349 (4th
Cir. 2005) (quoting <u>Iodice v. United States</u>, 289 F.3d 270, 281
(4th Cir. 2002)).  Rather, it need only "allege facts sufficient
to state elements" of the claim.  <u>Id.</u>; <u>Bass v. E.I. Dupont de
Nemours & Co.</u>, 324 F.3d 761, 765 (4th Cir. 2003).

        A motion to dismiss for lack of subject matter
jurisdiction pursuant to Rule 12(b)(1) may be presented in one of
two ways.  <u>United States v. North Carolina</u>, 180 F.3d 574, 580
(4th Cir. 1999).  The one chosen by defendant here is a challenge
to the complaint for failure to allege facts upon which subject
matter jurisdiction can be based.  <u>Adams v. Bain</u>, 697 F.2d 1213,

11

1219 (4th Cir. 1982).  In such a situation, the facts alleged by plaintiff are assumed to be true, giving him the same procedural protection as he would be accorded by Rule 12(b)(6).  Id.

B.   Sufficiency of the Claim Pled and Qualified Immunity

1.   Governing Law

In Trulock v. Freeh, 275 F.3d 391 (4th Cir. 2001), our court of appeals observed as follows:

> The First Amendment guarantees an individual the right to speak freely, including the right to criticize the government and government officials.  To protect that right, public officials are prohibited from retaliating against individuals who criticize them. Fear of retaliation may chill an individual's speech, and, therefore, permit the government to "'produce a result which [it] could not command directly.'"

Id. at 404.

The analysis governing such a claim is controlled by our court of appeals' decision in Suarez Corp. Indus. v. McGraw, 202 F.3d 676, 685 (4th Cir. 2000).  McGraw involved a First Amendment retaliation claim by a direct mail marketer and some of its customers against the Attorney General of West Virginia and one of his deputies.  The plaintiffs attributed a variety of alleged defamatory statements to the defendants that ostensibly

12

chilled plaintiffs' exercise of their First Amendment rights.

The court of appeals in McGraw laid down the now well-established three-part test for ascertaining the viability of a section 1983, First Amendment retaliation claim by a private citizen against a public official:

> In light of these principles, a § 1983 retaliation plaintiff must establish three elements in order to prove a First Amendment § 1983 retaliation claim. First, the plaintiff must demonstrate that his or her speech was protected. Second, the plaintiff must demonstrate that the defendant's alleged retaliatory action adversely affected the plaintiff's constitutionally protected speech. Third, the plaintiff must demonstrate that a causal relationship exists between its speech and the defendant's retaliatory action.

Id. at 686 (citations omitted); see also, e.g., Constantine v. Rectors and Visitors of George Mason Univ., 411 F.3d 474, 499 (4th Cir. 2005); Trulock, 275 F.3d at 404.

Regarding the second element, the court of appeals has held that "a plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter 'a person of ordinary firmness' from the exercise of First Amendment rights." Constantine, 411 F.3d at 500 (quoted authority omitted). Regarding the causation element, Constantine provides as follows:

> In order to establish this causal connection, a plaintiff in a retaliation case must show, at the very least, that the defendant was aware of her engaging in

13

protected activity.  "Knowledge alone, however, does
not establish a causal connection" between the
protected activity and the adverse action.  There must
also be some degree of temporal proximity to suggest a
causal connection. "A lengthy time lapse between the
[public official's] becoming aware of the protected
activity and the alleged adverse . . . action . . .
negates any inference that a causal connection exists
between the two."

Id. (quoted authority omitted).

From a general standpoint, the court of appeals in

McGraw further observed as follows:

Determining whether a plaintiff's First Amendment
rights were adversely affected by retaliatory conduct
is a fact intensive inquiry that focuses on the status
of the speaker, the status of the retaliator, the
relationship between the speaker and the retaliator,
and the nature of the retaliatory acts.

. . . .

The nature of the alleged retaliatory acts has
particular significance where the public official's
acts are in the form of speech. Not only is there an
interest in having public officials fulfill their
duties, a public official's own First Amendment speech
rights are implicated. Thus, where a public official's
alleged retaliation is in the nature of speech, in the
absence of a threat, coercion, or intimidation
intimating that punishment, sanction, or adverse
regulatory action will imminently follow, such speech
does not adversely affect a citizen's First Amendment
rights, even if defamatory.

McGraw, 202 F.3d at 686 (emphasis added).

The foregoing authorities guiding the Rule 12(b)(6)

claim-sufficiency analysis are also relevant to the qualified

14

immunity calculus.  This is so in view of the two-step process
culminating in a qualified immunity ruling.  The Supreme Court
summed up the analysis in <u>Saucier v. Katz</u>, 533 U.S. 194, 201-02
(2001):

> A court required to rule upon the qualified
> immunity issue must consider, then, this threshold
> question: Taken in the light most favorable to the
> party asserting the injury, do the facts alleged show
> the officer's conduct violated a constitutional right?
> . . . .
>
> If no constitutional right would have been
> violated were the allegations established, there is no
> necessity for further inquiries concerning qualified
> immunity. On the other hand, if a violation could be
> made out on a favorable view of the parties'
> submissions, the next, sequential step is to ask
> whether the right was clearly established. This
> inquiry, it is vital to note, must be undertaken in
> light of the specific context of the case, not as a
> broad general proposition . . . .
>
> In this litigation, for instance, there is no
> doubt that . . . [it is] clearly establishe[d] . . .
> that use of force is contrary to the Fourth Amendment
> if it is excessive under objective standards of
> reasonableness. Yet that is not enough. Rather . . .
> "that the right the official is alleged to have
> violated must have been 'clearly established' in a . .
> . particularized, and hence more relevant, sense: The
> contours of the right must be sufficiently clear that a
> reasonable official would understand that what he is
> doing violates that right."  The relevant, dispositive
> inquiry in determining whether a right is clearly
> established is whether it would be clear to a
> reasonable officer that his conduct was unlawful in the
> situation he confronted.

<u>Saucier v. Katz</u>, 533 U.S. 194, 201-02 (2001)(citations omitted).

The Supreme Court in <u>Saucier</u> also observed that timing is critical when considering this species of immunity defense:

> Where the defendant seeks qualified immunity, a ruling on that issue should be made early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation."  The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial."  As a result, "we repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation."

<u>Id.</u> at 200-01.


2.  The Claim-Sufficiency Examination and Step One in the Qualified Immunity Analysis


a.    The First <u>McGraw</u> Element


The court first examines if, taking the facts in the light most favorable to the plaintiff, the complaint's allegations set out a violation of a constitutional right. Turning to the <u>McGraw</u> factors, the court has little difficultly determining that plaintiff engaged in protected speech.  At the center of this controversy is plaintiff's well-documented participation in state politics on a very divisive public-policy question.  Specifically, he devoted an arsenal of media buys and

16

interviews to promoting his position on one side of the political divide regarding an issue of paramount public importance that was ultimately presented to the statewide electorate. This type of political speech is constitutionally sacrosanct. See New York Times Co. v. Sullivan, 376 U.S. 254, 269 (1964) ("The general proposition that freedom of expression upon public questions is secured by the First Amendment has long been settled by our decisions. The constitutional safeguard, we have said, 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'") (citations omitted); Trulock, 275 F.3d at 403 ("The First Amendment guarantees an individual the right to speak freely, including the right to criticize the government and government officials."). Indeed, the defendant does not appear to contend otherwise.

        b.    The Second McGraw Element

        The center of gravity for the parties' dispute appears to rest on the second factor, namely, whether it has been sufficiently demonstrated at this stage of the litigation that the defendant's alleged threats and retaliatory action adversely affected plaintiff's constitutionally protected speech. The

17

analysis begins with examination of the status of the speaker,
the retaliator, the relationship between the two, and the nature
of the alleged retaliatory acts.  The court further examines (1)
whether the defendant's comments contained a threat, coercion, or
intimidation intimating imminent sanction or adverse regulatory
action, and (2) whether the allegedly retaliatory conduct would
deter 'a person of ordinary firmness' from exercising his First
Amendment rights.  This analysis, again, is undertaken with an
obedient eye toward the uncompromising, plaintiff-centered Rule
12(b)(6) standard.

        The speaker is a private citizen holding the reins of
one of the state's largest coal producers.  The alleged
retaliator is the state's chief law enforcement officer.  The
relationship between the two is best exhibited by the fact that
the industry in which plaintiff finds himself is also one over
which the state exercises robust oversight powers.  <u>See</u>, <u>e.g.</u>,
Jeff L. Lewin <u>et al.</u>, <u>Unlocking the Fire: a Proposal for Judicial</u>
<u>or Legislative Determination of the Ownership of Coalbed Methane</u>,
94 W. Va. L. Rev. 563, 599 (1992) ("The coal industry . . . [is]
heavily regulated . . . .").

        According to plaintiff, the alleged retaliatory acts
include "(i) a threat of tougher governmental scrutiny of Mr.

18

Blankenship; (ii) a threat of tougher governmental scrutiny of his employer, Massey; and (iii) a bad-faith investigation into alleged 'possible safety concerns' related to Massey-owned coal silos in Raleigh County." (Pl.'s Resp. at 8). Plaintiff thus alleges both a threat and a threat ostensibly accompanied by retaliatory acts. One must carefully examine plaintiff's categorization, and the content of the news article central to the dispute, to determine whether the complaint's allegations satisfy the rigors of the second <u>McGraw</u> element.

The news article must first be placed in an appropriate temporal and substantive context. The piece's contents are derived from the defendant's media responses specific to the bond proposal and immediately following a speech he delivered just eight (8) days before the special election. The comments came after the defendant was "quizzed repeatedly by reporters about his pension bond battle with Blankenship." One can reasonably infer the defendant's disapproval of the content of plaintiff's speech by reference to his suggestion that plaintiff should "use his creative energies in a good, positive manner." This statement indicates disapproval of both (1) plaintiff's contrary position on the bond proposal, and (2) his manner of propagating his views.

19

There are several considerations, taken in the light most favorable to the plaintiff, that work in satisfaction of the required coercion or intimidation suggesting imminent sanction or adverse regulatory action.  First, one's attention is drawn to the reporter's paraphrased observation by the defendant that plaintiff "should expect tougher scrutiny of his business affairs" as a result of plaintiff's position on the bond proposal.  The suggestion is followed immediately by the quoted statement "that [tougher scrutiny] is justified now, since Don has jumped in there with his personal wealth trying to direct public policy."

Second, the article notes that when the defendant was asked whether plaintiff's media campaign opposing the bond proposal "should and will prompt even more scrutiny of" plaintiff, the defendant did not disavow the suggested course of action but instead somewhat equivocally observed that "If you want to throw yourself into public policy, your record is open . . . ."  The defendant then further observed that the corporate entity led by the plaintiff, an entity that is the subject of ongoing, intensive regulation by the state, has committed "many [environmental] violations that hopefully they've been able to correct . . . ."

In addition to the alleged threats, plaintiff points separately to accompanying acts of retaliation.  The defendant's attributed observation concerning closer scrutiny of plaintiff's business affairs was followed by DEP's preliminary approval of Massey's coal silo plan just five days after the election.  That DEP approval, however, was then ultimately upended by the apparently contemporaneous order from the defendant to members of his senior staff to meet with various state regulators to investigate alleged possible safety concerns related to the proposed silo.  Plaintiff alleges the safety concerns were already fully aired to the DEP and not previously a personal concern of the defendant.  Plaintiff further asserts it can be inferred from this time line of events that the defendant was simply making good on his perceived promise of increased scrutiny of plaintiff and Massey.

Each of these considerations will no doubt be the subject of extensive discovery and further development.  This additional investigation will likely reveal much play in the joints on both sides of the adversarial divide.  Additionally, one can only guess how jurors might weigh the competing explanations and proposed inferences if given the opportunity to pass upon the evidence in the case.  At this juncture, however,

and again taking plaintiff's version of events and reasonable
inferences as fully accurate, the court concludes both the
alleged threats and retaliatory conduct would deter "a person of
ordinary firmness" from exercising his or her First Amendment
rights.  From plaintiff's perspective, the alleged factual
scenario "pose[s] a difficult dilemma, in which . . . [plaintiff]
is forced to choose between continuing to exercise his First
Amendment Rights, on the one hand, and, on the other, ceasing or
scaling back his exercise of those rights in order to protect the
business affairs of Massey, as well as his own business affairs,
from retaliatory government scrutiny."  (Pl.'s Resp. at 5-6.)[3]

_____

[3]Defendant counters in his reply brief that plaintiff has
continued since the defendant's June 17 comments to outspokenly
criticize state government and the governor.  The court notes the
inquiry on the second element is largely objective rather than
subjective.  Further, were it otherwise, the argument would not
necessarily spell the demise of plaintiff's claim.  For example,
plaintiff might assert he would have engaged in more speech, been
more critical, or fashioned his speech in some different manner
had the defendant's comments and additional alleged retaliation
not entered the fray.  The retaliatory actions need only
"deter[,]" not halt altogether, the exercise of one's protected
speech.  See also Constantine, 411 F.3d at 500 ("We reject the
defendants' suggestion that this inquiry depends upon the actual
effect of the retaliatory conduct on a particular plaintiff. We
have never held that a plaintiff must prove that the allegedly
retaliatory conduct caused her to cease First Amendment activity
altogether.  The cause of action targets conduct that tends to
chill such activity, not just conduct that freezes it
completely.").  In any event, defendant's argument is not the
sort upon which the court could dismiss the case under Rule
12(b)(6), especially when raised for the first time in reply.

Lending further credence to the objective understanding of the defendant's comments is the situation Massey encountered with its potential lessor.  This apparently disinterested observer, based on defendant's comments, feared Massey would be targeted for governmental sanctions that would impair its obligations under the potential lease.

      c.    The Third <u>McGraw</u> Element

      The court next analyzes the third and final factor, namely, whether plaintiff has demonstrated a causal relationship between his speech and the defendant's alleged retaliation.  It is undisputed that defendant was aware that plaintiff was engaged in protected activity.  Further, as illustrated by the foregoing discussion, there is a relatively tight fit between plaintiff's protected activity, the perceived threatening remarks, and the alleged fruits of those remarks.  This close temporal perspective is suggestive of a causal connection and the time line is sufficient at this stage for causation purposes.  <u>See</u> <u>Constantine</u>, 411 F.3d at 501 ("At most, four months elapsed from the time Constantine complained about Professor Lund's exam and the grade appeals process to the time of the defendants' alleged retaliatory conduct. Although we noted that a nine-month lapse

created a 'very close question' as to causal connection in <u>Price</u>,
we nevertheless concluded that the plaintiff's claim survived a
motion to dismiss.  Likewise, we are satisfied that Constantine's
complaint adequately alleges a causal connection between her
First Amendment activity and the defendants' alleged
misconduct.")

Based upon the preceding discussion, the facts alleged
can be taken at this early stage as satisfying the claim's
requirement that the defendant's conduct violated plaintiff's
right to be free from retaliation by a public official for the
exercise of his First Amendment rights.

## 2.  Clearly Established Law

The question under this second and final step in the
qualified immunity analysis is "whether a reasonable [official]
could have believed [the challenged conduct] to be lawful, in
light of clearly established law" at the time of the alleged
retaliation.  <u>Anderson v. Creighton</u>, 483 U.S. 635, 641 (1987). It
is important to note that the law is clearly established for
qualified immunity purposes not only when "the very action in
question has previously been held unlawful," but also when

"pre-existing law" makes the "unlawfulness" of the act "apparent." Id. at 640.

Distilled to its essence, in accordance with the plaintiff-friendly Rule 12(b)(6) standard, one must ask whether, in June 2005, a reasonable chief executive officer of a state could have believed that publicly threatening close governmental scrutiny of a political opponent's business affairs, resulting in the reluctance of a potential landlord of the corporate entity managed by plaintiff to enter into a lease with it, was justified if based solely upon the content of the opponent's speech. Similarly, could a reasonable chief executive officer of a state have then believed that insinuating close governmental scrutiny of a political opponent's business affairs, followed up just days later by actions putatively designed to retaliate against the corporate entity run by the opponent, was justified if based solely upon the content of the opponent's speech. Our court of appeals in 2001 observed that "[i]t is well established that a public official may not misuse his power to retaliate against an individual for the exercise of a valid constitutional right." Trulock, 275 F.3d at 405. See also McGraw, 202 F.3d at 685.[4]

---

[4]Defendant appears to suggest he is entitled to qualified immunity unless a binding case on all fours counseled against his alleged comments and actions. The law is to the contrary. See Wilson v. Layne, 526 U.S. 603, 615 (1999) (holding that precise
(continued...)

      The court concludes, in view of the foregoing analysis, that the defendant has not shown entitlement to qualified immunity at this stage of the case.  The court is nevertheless mindful of the chief executive officer's sworn responsibility and solemn duty to faithfully execute the laws of the state of which he is Governor--a factor that is to be given due consideration throughout this litigation.

C.  Standing[5]

      After noting the complaint's reference to the Massey silo controversy, and the landlord's concern about entering into a lease agreement with Massey, the defendant asserts plaintiff lacks standing to pursue this action.  The defendant relies primarily upon our court of appeals' decision in <u>Burke v. City of Charleston</u>, 139 F.3d 401, 403 (4th Cir. 1998), along with the

---

    [4](...continued)
conduct need not have been previously held unlawful in order for qualified immunity to be forfeited); <u>Amaechi v. West</u>, 237 F.3d 356, 362-63 (4th Cir. 2001) (denying qualified immunity despite absence of factually similar precedent).

    [5]The court would ordinarily have first addressed the issue of standing, given its jurisdictional dimension.  To facilitate the discussion of the issues, however, the court has deferred the inquiry to this later section.

well-settled principle that "a plaintiff generally must assert
his own legal rights and interests, and cannot rest his claim to
relief on the legal rights or interests of third parties." <u>Warth
v. Seldin</u>, 422 U.S. 490, 499 (1975).

It is incumbent upon every federal plaintiff to
establish standing to prosecute a civil action. <u>Elk Grove
Unified School Dist. v. Newdow</u>, 542 U.S. 1, 11 (2004). "In
essence the question of standing is whether the litigant is
entitled to have the court decide the merits of the dispute or of
particular issues." <u>Warth</u>, 422 U.S. at 498. There are two types
of standing that can be identified from Supreme Court precedent,
both nicely summarized in <u>Newdow</u>:

> [O]ur standing jurisprudence contains two strands:
> Article III standing, which enforces the Constitution's
> case or controversy requirement . . . and prudential
> standing, which embodies "judicially self-imposed
> limits on the exercise of federal jurisdiction[.]" . .
> . The Article III limitations are familiar: The
> plaintiff must show that the conduct of which he
> complains has caused him to suffer an "injury in fact"
> that a favorable judgment will redress. Although we
> have not exhaustively defined the prudential dimensions
> of the standing doctrine, we have explained that
> prudential standing encompasses "the general
> prohibition on a litigant's raising another person's
> legal rights, the rule barring adjudication of
> generalized grievances more appropriately addressed in
> the representative branches, and the requirement that a
> plaintiff's complaint fall within the zone of interests
> protected by the law invoked."

<u>Newdow</u>, 542 U.S. at 11-12 (citations and quoted authority

27

omitted).  In other cases, the Supreme Court has stated more particularly the elements of Article III standing:

> On many occasions, we have reiterated the three requirements that constitute the "'irreducible constitutional minimum'" of standing.  First, a plaintiff must demonstrate an "injury in fact," which is "concrete," "distinct and palpable," and "actual or imminent."  Second, a plaintiff must establish "a causal connection between the injury and the conduct complained of--the injury has to be 'fairly trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] some third party not before the court.'"  Third, a plaintiff must show the "'substantial likelihood' that the requested relief will remedy the alleged injury in fact."

McConnell v. Federal Election Comm'n, 540 U.S. at 225-26 (2003).

Burke involved an artist who sought redress when a mural he had begun painting, on a building he did not own, was ordered removed by the city's board of architectural review.  One readily appreciates the standing shortcomings in that fact pattern.  In contrast, plaintiff here has pled injuries in fact.  These injuries are the chilling of, and retaliation for, protected speech.  They arise from the defendant's suggestion of tougher scrutiny of plaintiff's business affairs arising from plaintiff's vocal opposition to the bond proposal, along with the alleged bad faith silo investigation.

The second element is also satisfied.  The injuries suffered by plaintiff are directly traceable to the defendant's

observations during media questioning on June 17 and directions to his senior staff on June 30 to become involved in the developing silo controversy.  The defendant, however, appears concerned that plaintiff is attempting to impermissibly assert violations of Massey's rights by alluding to the harm suffered by the corporate entity as a result of the silo controversy and the landlord's reluctance to enter a lease agreement.  This is a decidedly myopic view of the theory behind this case, as illustrated by plaintiff's response: "The harm to Massey is relevant insofar as it demonstrates the means by which the Governor has attempted and is continuing to attempt to suppress Mr. Blankenship's right to free speech."  (Pl.'s Resp. at 23-24.) As noted, given his multiple leadership positions within the company, plaintiff is undeniably at Massey's helm.  One bent on seeking to apply pressure to plaintiff's business pursuits, then, could reasonably be expected to target Massey.

The third standing element is also satisfied.  Among other forms of relief, plaintiff seeks a declaration that the defendant violated plaintiff's First Amendment rights by making the challenged comments on June 17.  One has difficulty imagining a closer nexus between one of the injuries in fact, being a threat of retaliation, and the relief sought, being the

characterization of that threat as illegal chilling of protected speech.  Should a finding of illegality occur, it would lead to, at a minimum, a prospective alteration in the defendant's alleged unconstitutional treatment of plaintiff.

Based upon the foregoing, the court concludes plaintiff has adequately alleged standing.[6]

D.   Other Arguments

The defendant's remaining arguments can be disposed of summarily.  First, it is asserted that plaintiff is not entitled to recover damages on the claim against the defendant in his official capacity.  This proposition is well-settled.  <u>See</u>, <u>e.g.</u>, <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 465 U.S. 89, 102-03 (1984); <u>Edelman v. Jordan</u>, 415 U.S. 651, 666-69 (1974); <u>Ballenger v. Owens</u>, 352 F.3d 842, 845 (4th Cir. 2003).  Equally clear, however, is that plaintiff may recover damages from the defendant in his individual capacity.  <u>See</u>, <u>e.g.</u>, <u>Kentucky v. Graham</u>, 473

_____

[6]This ruling does not preclude the defendant from later asserting that plaintiff is seeking relief (1) to which he is not entitled personally, (2) from entities that are not parties to this action, or (3) in an otherwise overbroad or inappropriate fashion.  Those arguments, however, are properly reserved for that juncture of the case, should it come, where the court undertakes to fashion declaratory or injunctive relief.

U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); <u>Sales v.</u>
<u>Grant</u>, 224 F.3d 293, 297 (4th Cir. 2000).

      Second, defendant asserts plaintiff is not entitled to
injunctive relief because of a failure to allege an ongoing
violation of his First Amendment rights.  Based upon the
discussion in section II.B, the court deems plaintiff to have
adequately alleged an ongoing violation of federal law.
Discovery, of course, may demonstrate otherwise.  Dismissal of a
claim for injunctive relief at this early stage of the case,
however, would be inappropriate.

      Finally, for the first time in reply, defendant raises
a <u>Younger</u> abstention challenge.  Defendant asserts that on August
1, 2005, a Massey subsidiary, Goals Coal, appealed to the West
Virginia Surface Mine Board challenging the DEP's decision to
revoke the permit that would have allowed construction of the
Raleigh County coal silo.  Defendant asserts the state
administrative proceeding is an adequate forum for resolving the
portion of the retaliation claim dealing with the silo
controversy.  This argument fails for the reason that plaintiff
is not a party to the state administrative proceeding.  Since he
is not a party, the state proceeding would obviously not provide

him an opportunity to raise his constitutional claim.[7]

### III.

Based upon the foregoing discussion, the court ORDERS as follows:

1.   That defendant's motion to dismiss be, and it hereby is, denied, except as to the claim for damages against him in his official capacity which is dismissed; and

2.   That defendant's motion to stay discovery be, and it hereby is, denied as moot.

---

[7]Our court of appeals recently re-stated the settled test for determining the propriety of Younger abstention:

"[A] federal court should abstain from interfering in a state proceeding, even though it has jurisdiction to reach the merits, if there is (1) an ongoing state judicial proceeding, instituted prior to any substantial progress in the federal proceeding; that (2) implicates important, substantial, or vital state interests; and (3) provides an adequate opportunity for the plaintiff to raise the federal constitutional claim advanced in the federal lawsuit."

Moore v. City of Asheville, 396 F.3d 385, 390 (4th Cir. 2005) (citations omitted).

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: January 18, 2006

John T. Copenhaver, Jr.
United States District Judge